Affirmed in part, vacated in part, reversed in part, and remanded by published opinion. Judge MOTZ wrote the majority opinion, in which Judge DIAZ joined. Judge WILKINSON wrote a dissenting opinion.
DIANA GRIBBON MOTZ, Circuit Judge:
This is an appeal from a judgment in favor of R.J. Reynolds Tobacco Company *351 and R.J. Reynolds Tobacco Holdings, Inc. (collectively “RJR”). Richard Tatum brought this suit on behalf of himself and other participants in RJR’s 401(k) retirement savings plan (collectively “the participants”). He alleges that RJR breached its fiduciary duties under the Employee Retirement Income Security Act (“ERISA”), 29 U.S.C. § 1001 et seq., when it liquidated two funds held by the plan on an arbitrary timeline without conducting a thorough investigation, thereby causing a substantial loss to the plan.
After a bench trial, the district court found that RJR did indeed breach its fiduciary duty of procedural prudence and so bore the burden of proving that this breach did not cause loss to the plan participants. But the court concluded that RJR met this burden by establishing that “a reasonable and prudent fiduciary could have made [the same decision] after performing [a proper] investigation.” Tatum v. R.J. Reynolds Tobacco Co., 926 F.Supp.2d 648, 651 (M.D.N.C.2013) (emphasis added). We affirm the court’s holdings that RJR breached its duty of procedural prudence and therefore bore the burden of proof as to causation. But, because the court then failed to apply the correct legal standard in assessing RJR’s liability, we must reverse its judgment and remand the case for further proceedings consistent with this opinion.
I.
A.
In March 1999, fourteen years after the merger of Nabisco and R.J. Reynolds Tobacco into RJR Nabisco, Inc., the merged company decided to separate its food business, Nabisco, from its tobacco business, R.J. Reynolds. The company determined to do this through a spin-off of the tobacco business. The impetus behind the spin-off was the negative impact of tobacco litigation on Nabisco’s stock price, a phenomenon known as the “tobacco taint.” As the district court found, “[t]he purpose of the spin-off was to ‘enhance shareholder value,’ which included increasing the value of Nabisco by minimizing its exposure to and association with tobacco litigation.” Id. at 658-59.
Prior to the spin-off, RJR Nabisco sponsored a 401 (k) plan, which offered its participants the option to invest their contributions in any combination of eight investment funds. The plan offered six fully diversified funds — some containing investment contracts, fixed-income securities, and bonds; some containing a broad range of domestic or international stocks; and some containing a mix of stocks and bonds. The plan also offered two company stock funds — the Nabisco Common Stock Fund, which held common stock of Nabisco Holdings Corporation, and the RJR Nabisco Common Stock Fund, which held stock in both the food and tobacco businesses. After the spin-off, the RJR Nabisco Common Stock Fund was divided into two separate funds: the Nabisco Group Holdings Common Stock Fund (“Nabisco Holdings”), which held the stock from the food business, and the RJR Common Stock Fund, which held the stock from the tobacco business.[1]
The 401(k) plan at issue in this case (“the Plan”) was created on June 14, 1999, the date of the spin-off, by amendment to the existing RJR Nabisco plan. The Plan expressly provided for the retention of the *352 Nabisco Funds as “frozen” funds in the Plan. Freezing the Nabisco Funds permitted participants to maintain their existing investments in the Nabisco Funds, but prevented participants from purchasing through the Plan additional shares of those funds. As the district court found, “[t]here was no language in the [Plan] eliminating the Nabisco Funds or limiting the duration in which the Plan would hold the funds.” Id. at 657-58. The Plan also retained as investment options the six diversified funds offered in the pre-spin-off plan, as well as the RJR Common Stock Fund.
The Plan named as Plan fiduciaries two committees composed of RJR officers and employees: the Employee Benefits Committee (“Benefits Committee”), responsible for general Plan administration, and the Pension Investment Committee (“Investment Committee”), responsible for Plan investments. The Plan vested the Benefits Committee with authority to make further amendments to the Plan by a majority vote of its members at any meeting or by an instrument in writing signed by a majority of its members.
Notwithstanding the requirement in the governing Plan document that the Nabisco Funds remain as frozen funds in the Plan, RJR determined to eliminate them from the Plan. RJR further determined to sell the Nabisco Funds approximately six months after the spin-off. These decisions were made at a March 1999 meeting by a “working group,” which consisted of various corporate employees. Id. at 656-57. But, as the district court found, the working group “had no authority or responsibility under the then-existing Plan documents to implement any decision regarding the pre-spin[-off| RJR Nabisco Holdings Plan, nor [was it] later given authority to make or enforce decisions in the [RJR] Plan documents.” Id. at 655.
According to testimony from members of the working group, the group spent only thirty to sixty minutes considering what to do with the Nabisco Funds in RJR’s 401(k) plan. The working group “discussed reasons to remove the funds [from the plan] and assumed that [RJR] did not want Nabisco stocks in its 401(k) plan due to the high risk of having a single, non-employer stock fund in the Plan.” Id. at 656. The members of the working group also discussed “their [incorrect] belief that such funds were only held in other [companies’] plans as frozen funds in times of transition.” Id. Several members of the working group “believed that a single stock fund in the plan would be an ‘added administrative complexity’ and incur additional costs.” Id. But the group “did not discuss specifically what the complexities were or the amount of costs of keeping the fund in the Plan, as balanced against any benefit to participants.” Id. The working group agreed that the Nabisco Funds should be frozen at the time of the spin-off and eventually eliminated from the Plan. In terms of the timing of the divestment, a member of the working group testified that “[t]here was a general discussion, and different ideas were thrown out, would three months be appropriate, would a year be appropriate, and everybody got very comfortable with six months.” Id. There was no testimony as to why six months was determined to be an appropriate time-frame.
The working group’s recommendation was reported back to Robert Gordon, RJR’s Executive Vice President for Human Resources and a member of both the Benefits Committee and the Investment Committee. Gordon testified at trial that the members of the Benefits Committee agreed with the working group’s recommendation. But the district court found that aside from this testimony, there was *353 no evidence that the Benefits Committee “met, discussed, or voted on the issue of eliminating the Nabisco Funds or otherwise signed a required consent in lieu of a meeting authorizing an amendment that would do so.” Id. at 657.[2]
In the months immediately following the June 1999 spin-off, the Nabisco Funds declined precipitously in value. Markets reacted sharply to numerous class action tobacco lawsuits pending against RJR, which continued to impact the value of Nabisco stock as a result of the “tobacco taint.” Id. at 659-60. Despite this decline in value, however, analyst reports throughout 1999 and 2000 rated Nabisco stock positively, “overwhelmingly recommending [to] ‘hold’ or ‘buy,’ particularly after the spinoff.” Id. at 662.
In early October 1999, various RJR human resources managers, corporate executives, and in-house legal staff met to discuss possible reconsideration of the decision made by the working group in March to sell the Nabisco Funds. Id. at 661. They decided against changing course, however, largely because they feared doing so would expose RJR to liability from employees who had already sold their shares of the Nabisco Funds in rebanee on RJR’s prior communications. Id. at 661-62.[3] The working group considered that this perceived liability risk could have been mitigated by temporarily unfreezing the Nabisco Funds and allowing Plan participants to reinvest if desired. But RJR was concerned that participants might view such action as a recommendation to hold or reinvest in Nabisco Funds and then blame RJR if the funds further declined. Id. at 661.
Moreover, RJR was concerned that keeping Nabisco Funds in the Plan would require the fiduciaries “to monitor and investigate them on a continuing basis and at significant expense paid from the Plan’s trust.” Id. at 662. Nevertheless, RJR decided against hiring “a financial consultant, outside counsel, and/or independent fiduciary to assist” it in resolving these questions and “deciding whether and when to eliminate the Nabisco Funds.” Id. As-sertedly, this was so because RJR believed that the Plan would have to pay the cost of such assistance. Id. But, as the district court found, “[t]he issue of monitoring the funds and how independent consultants were paid was not discussed at length or investigated.” Id.
Later in October 1999, RJR sent a letter to Plan participants informing them that it would eliminate the Nabisco Funds from the Plan as of January 31, 2000. Id. at 663-64. The letter erroneously informed participants that the law did not permit the Plan to maintain the Nabisco Funds. Specifically, the letter stated: “Because regulations do not allow the Plan to offer ongoing investment in individual stocks other than Company stock, the ‘frozen’ [Nabisco] stock funds will be eliminated.” Id. at 664 (alteration in original).
*354 The human resources manager who drafted the letter testified at trial that she did so at the direction of Gordon, and that, at the time she prepared this letter, she knew the statement was incorrect. Id. No lawyer reviewed the letter before it was sent to participants. And, as the district court found, the statement “was never corrected, even after responsible RJR officials were informed that it was wrong.” Id. Rather, a second letter, sent in January 2000, repeated the incorrect statement. “By that time,” the district court found, “RJR’s managers, including its lawyers, had become aware that the statement was false, but nevertheless permitted the communication to be sent to participants.” Id.
On January 27, 2000, days before the scheduled sale, plaintiff Richard Tatum sent an e-mail to both Gordon and Ann Johnston, Vice President for Human Resources and a member of the Benefits Committee and the Investment Committee. In this email, Tatum asked that RJR not go through with the forced sale of the Plan’s Nabisco shares because it would result in a 60% loss to his 401(k) account. Tatum indicated that he wanted to wait to sell his Nabisco stock until its price rebounded, and he noted that company communications had been “optimistic” that Nabisco stock would increase in value after the spin-off. He also related his understanding that former RJR employees of Winston-Salem Health Care and Winston-Salem Dental Care still retained frozen Nabisco and RJR funds in their 401(k) plans, even though those companies had been acquired by a different company, No-vant, in 1996. (This claim was later substantiated through evidence at trial. See id. at 667 n. 15.) In response to Tatum’s concerns, Johnson replied that nothing could be done to stop the divestment. Id. at 667.
On January 31, 2000, RJR went through with the divestment and sold the Nabisco shares held by employees in their 401(k) accounts. Between June 15, 1999 (the day after the spin-off) and January 31, 2000, the market price for Nabisco Holdings stock had dropped by 60% to $8.62 per share, and the price for Nabisco Common Stock had dropped by 28% to $30.18 per share. Id. at 665.
RJR invested the proceeds from the sale of the Nabisco stock in the Plan’s “Interest Income Fund,” which consisted of short-term investments, such as guaranteed investment contracts and government bonds. Id. The proceeds remained in the Interest Income Fund until a participant took action to reinvest them in one of the other six funds offered in the Plan. Id. At the same time as RJR eliminated Nabisco stocks from the employees’ 401(k) Plan, several RJR corporate officers opted to retain their personal Nabisco stock or stock options. Id. at 665-66.
A few months after the divestment, in the early spring of 2000, Nabisco stock began to rise in value. On March 30, Carl Icahn made his fourth attempt at a takeover of Nabisco in the form of an unsolicited tender offer to purchase Nabisco Holdings for $13 per share. Id. at 666. The district court noted that “[b]efore his unsolicited offer, Icahn had made three previous attempts to take over Nabisco, between November 1996 and the spring of 1999, and was well known to have an interest in the company.” Id. This tender offer provoked a bidding war, and, on December 11, 2000, Philip Morris acquired Nabisco Common Stock at $55 per share and infused Nabisco Holdings with $11 billion in cash. RJR then purchased Nabisco Holdings for approximately $30 per share. As compared to the January 31, 2000 divestment prices, these share prices represented an increase of 247% for Nabisco Hold *355 ings stock and 82% for Nabisco Common Stock. Id.
B.
In May 2002, Tatum filed this class action against RJR as well as the Benefits Committee and the Investment Committee, asserting that they acted as Plan fiduciaries. Tatum alleged that these Plan fiduciaries breached their fiduciary duties under ERISA by eliminating Nabisco stock from the Plan on an arbitrary time-line without conducting a thorough investigation. He further claimed that their fiduciary breach caused substantial loss to the Plan because it forced the sale of the Plan’s Nabisco Funds at their all-time low, despite the strong likelihood that Nabisco’s stock prices would rebound.
In 2003, the district court granted RJR’s motion to dismiss, concluding that Tatum’s allegations involved “settlor” rather than “fiduciary” actions, meaning that the decision to eliminate the Nabisco Funds from the Plan was non-discretionary. We reversed, holding that the Plan documents did not mandate divestment of the Nabisco Funds, and thus did not preclude Tatum from stating a claim against the defendants for breach of fiduciary duty. Tatum v. R.J. Reynolds Tobacco Co., 392 F.3d 636, 637 (4th Cir.2004).
On remand, the district court granted RJR’s motion to dismiss the Benefits Committee and the Investment Committee as defendants. After the limitations period had expired, Tatum filed a motion seeking leave to amend his complaint to add the individual committee members as defendants, which the court denied.[4] The court then held a bench trial from January 13 to February 9, 2010 to determine whether RJR breached its fiduciary duties in eliminating the Nabisco Funds from the Plan.
On February 25, 2013, the court issued its final judgment, containing detailed and extensive factual findings. The court recognized (as we had held) that RJR’s decision to remove the Nabisco Funds from the Plan was a fiduciary act subject to the duty of prudence imposed by ERISA. Tatum, 926 F.Supp.2d at 673. The court then held that (1) RJR breached its fiduciary duties when it “decided to remove and sell Nabisco stock from the Plan without undertaking a proper investigation into the prudence of doing so,” id. at 651, and (2) as a breaching fiduciary, RJR bore the burden of proving that its breach did not cause the alleged losses to the Plan.' But the court further held that (3) RJR met its burden of proof because its decision to eliminate the Nabisco Funds was “one which a reasonable and prudent fiduciary could have made after performing such an investigation.” Id. (emphasis added).
Tatum noted a timely appeal.
II.
Congress enacted ERISA to protect “the interests of participants in employee benefit plans and their beneficiaries ... by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.” 29 U.S.C. § 1001(b). Consistent with this purpose, ERISA imposes high standards of fiduciary duty on those responsible for the administration of employee benefit plans and the investment and disposal of plan assets. As the Second *356 Circuit has explained, “[t]he fiduciary obligations of the trustees to the participants and beneficiaries of [an ERISA] plan are ... the highest known to the law.” Donovan v. Bierwirth, 680 F.2d 263, 272 n. 8 (2d Cir.1982).
Pursuant to the duty of loyalty, an ERISA fiduciary must “discharge his duties ... solely in the interest of the participants and beneficiaries.” 29 U.S.C. § 1104(a)(1). The duty of prudence requires ERISA fiduciaries to act “with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.” Id. § 1104(a)(1)(B). The statute also requires fiduciaries to act “in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA].” Id. § 1104(a)(1)(D). And fiduciaries have a duty to “diversify[] investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.” Id. § 1104(a)(1)(C). However, legislative history and federal regulations clarify that the diversification and prudence duties do not prohibit a plan trustee from holding single-stock investments as an option in a plan that includes a portfolio of diversified funds.[5] Moreover, the diversification duty does not apply to investments that fall within the exemption for employer stocks provided for in § 1104(a)(2).
A fiduciary who breaches the duties imposed by ERISA is “personally liable” for “any losses to the plan resulting from [the] breach.” Id. § 1109(a). Section 1109(a), ERISA’s fiduciary liability provision, provides in full:
Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchap-ter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.
Id. ERISA thus provides for both monetary and equitable relief, and does not (as the dissent claims) limit a fiduciary’s liability for breach of the duty of prudence to equitable relief.
In determining whether fiduciaries have breached their duty of prudence, we ask “whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.” DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 420 (4th Cir.2007). Our focus is on “whether the fiduciary engaged in a reasoned deeision[-]making process, consistent with that of a ‘prudent man acting in [a] like capacity.’ ” Id. (quoting 29 U.S.C. § 1104(a)(1)(B)).
When the fiduciary’s conduct fails to meet this standard, and the plaintiff has *357 made a prima facie case of loss, we next inquire whether the fiduciary’s imprudent conduct caused the loss. For “[e]ven if a trustee failed to conduct an investigation before making a decision,” and a loss occurred, the trustee “is insulated from liability ... if a hypothetical prudent fiduciary would have made the same decision anyway.” Plasterers’ Local Union No. 96 Pension Plan v. Pepper, 663 F.3d 210, 218 (4th Cir.2011) (quoting Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 919 (8th Cir.1994)).
ERISA’s fiduciary duties “draw much of their content from the common law of trusts, the law that governed most benefit plans before ERISA’s enactment.” DiFelice, 497 F.3d at 417 (quoting Varity Corp. v. Howe, 516 U.S. 489, 496, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)). Thus, in interpreting ERISA, the common law of trusts informs a court’s analysis. Id. “[TJrust law does not tell the entire story,” however, because “ERISA’s standards and procedural protections partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory protection.” Varity Corp., 516 U.S. at 497, 116 S.Ct. 1065. Therefore, courts must be mindful that, in “developing] a federal common law of rights and obligations under ERISA,” Congress “ex-pedís] that” courts “will interpret th[e] prudent man rule (and the other fiduciary duties) bearing in mind the special nature and purpose of employee benefit plans.” Id. (internal citations and quotation marks omitted).
On appeal, Tatum argues that, although the district court correctly determined that RJR breached its duty of procedural prudence and so bore the burden of proving that its breach did not cause the Plan’s loss, the court applied the wrong standard for determining loss causation. He contends that the court incorrectly considered whether a reasonable fiduciary, after conducting a proper investigation, could have sold the Nabisco Funds at the same time and in the same manner, as opposed to whether a reasonable fiduciary would have done so.
In response, RJR contends that the district court applied the appropriate causation standard. In the alternative, RJR urges us to reverse the district court’s holdings that it breached its duty of procedural prudence and that, as a breaching fiduciary, it bore the burden of proving that its breach did not cause the Plan’s loss.
“We review a judgment resulting from a bench trial under a mixed standard of review — factual findings may be reversed only if clearly erroneous, while conclusions of law are examined de novo.” Plasterers’, 663 F.3d at 215 (internal quotation marks omitted).
III.
We first consider the district court’s finding that RJR breached its duty of procedural prudence.[6]
*358 A.
ERISA requires fiduciaries to employ “appropriate methods to investigate the merits of the investment and to structure the investment” as well as to “engage[] in a reasoned decision[-]making process, consistent with that of a ‘prudent man acting in [a] like capacity.’ ” DiFelice, 497 F.3d at 420. The duty of prudence also requires fiduciaries to monitor the prudence of their investment decisions to ensure that they remain in the best interest of plan participants. Id. at 423.
“The evaluation is not a general one, but rather must ‘depend on the character and aim of the particular plan and decision at issue and the circumstances prevailing at the time.’ ” Id. at 420 (alteration omitted) (quoting Bussian v. RJR Nabisco, Inc., 223 F.3d 286, 299 (5th Cir.2000)). Of course, a prudent fiduciary need not follow a uniform checklist. Courts have found that a variety of actions can support a finding that a fiduciary acted with procedural prudence, including, for example, appointing an independent fiduciary, seeking outside legal and financial expertise, holding meetings to ensure fiduciary oversight of the investment decision, and continuing to monitor and receive regular updates on the investment’s performance. See, e.g., id. at 420-21; Bunch v. W.R. Grace & Co., 555 F.3d 1, 8-9 (1st Cir.2009); Laborers Nat’l Pension Fund v. N. Trust Quantitative Advisors, Inc., 173 F.3d 313, 322 (5th Cir.1999).[7] In other words, although the duty of procedural prudence requires more than “a pure heart and an empty head,” DiFelice, 497 F.3d at 418 (internal quotation marks and citation omitted), courts have readily determined that fiduciaries who act reasonably—i.e., who appropriately investigate the merits of an investment decision prior to acting— easily clear this bar.
B.
The district court carefully examined the relevant facts and made extensive factual findings to support its conclusion that RJR failed to engage in a prudent decision-making process.
The court found that “the working group’s decision in March 1999 was made with virtually no discussion or analysis and was almost entirely based upon the assumptions of those present and not on research or investigation.” Tatum, 926 F.Supp.2d at 678. Indeed, the court found that the group’s discussion of the Nabisco stocks lasted no longer than an hour and focused exclusively on removing the funds from the Plan.
The court further found “no evidence that the [working group] ever considered an alternative [to divestment within six months], such as maintaining the stock in a frozen fund indefinitely, making the time-line for divestment longer, or any other strategy to minimize a potential immediate loss to participants or any potential opportunity for gain.” Id. at 680. Instead, the “driving consideration” was the “general risk of a single stock fund,” as well as “the *359 emphasis on the unconfirmed assumption that RJR would no longer be exempt from the ERISA diversification requirement because the funds would no longer be employer stocks.” Id. at 678. Yet the evidence adduced at trial showed that “no one researched the accuracy of that assumption, and it was later determined that nothing in the law or regulations required that the Nabisco Funds be removed from the Plan.” Id. at 680.
The district court found that “the six month timeline for the divestment was chosen arbitrarily and with no research.” Id. at 679. The working group failed to consider “[t]he idea that, perhaps, it would take a while for the tobacco taint to dissipate” or “the fact that determining for employees exactly when the stocks would be removed could result in large and unnecessary losses to the Plan through the individual accounts of employees.” Id. Similarly, there was no consideration of “the purpose of the Plan, which was for long term retirement savings,” or “the purpose of the spin-off, which was, in large part, to allow the Nabisco stock a chance to recover from the tobacco taint and hopefully rise in value.” Id. at 678. The court found the failure to consider these issues particularly notable “[g]iven that the strategy behind the spin-off was largely to rid Nabisco stock prices of the ‘tobacco taint.’ ” Id. at 680.
The court also found that the only time following the spinoff that RJR “actually discussed the merits of the [March] decision was at the October 8, 1999 meeting.” Id. at 681. In that meeting, Gordon raised the concern from RJR’s CEO that “participants were questioning the timing of the elimination given the Nabisco stocks’ continued decline in value.” Id. Although RJR engaged in this additional discussion, it undertook no investigation into the assumptions underlying its March decision to sell the Plan’s Nabisco stock. Id. at 682.
Rather, those involved in the October discussion expressed “their view that the employees who cashed out their Nabisco stock at a loss were a problem,” and there was “fear that [these] early sellers might sue RJR.” Id. at 681 (internal quotation marks and alterations omitted). The court found that the discussion “focused around the liability of RJR, rather than what might be in the best interest of the participants.” Id. at 682 (emphasis in original). As a result, RJR failed to explore the option of amending the Plan to temporarily unfreeze the Nabisco Funds and give “the early sellers the opportunity to repurchase the stock.” Id. Nor did RJR consider any “other alternatives for remedying the problem.” Id. The court noted that, despite fearing liability, RJR “still did not engage an independent analyst or outside counsel to analyze the problem.” Id. at 681-82.
The court found no evidence of any other discussions in which RJR ever “contemplated any formal action other than what had already been decided at the March meeting.” Id. at 680. Instead, the evidence showed that RJR’s focus after the spin-off “was on setting a specific date for divestment and on providing notice to participants regarding the planned removal of the funds.” Id. at 680-81. “Indicative of the pervading mindset against reexamining the original decision were the communications known to be false when sent to participants” by RJR with the October 1999 and January 2000 401(k) statements. Id. at 681.
In sum, the district court found that “there [wa]s no evidence — in the form of documentation or testimony — of any process by which fiduciaries investigated, analyzed, or considered the circumstances regarding the Nabisco stocks and whether it *360 was appropriate to divest.” Id. at 679. The court explained that, in light of the fiduciary duty to act “solely in the interest of participants and beneficiaries,” it was clearly improper for the fiduciaries “to consider their own potential liability as part of the reason for not changing course on their decision to divest the Plan of Nabisco stocks.” Id. at 681 (emphasis in original). The district court concluded that “[t]he lack of effort on the part of those considering the removal of the Nabisco Funds — from March 1999 until the stock was removed from the plan on January 31, 2000 — compelled] a finding that the RJR decision-makers in this case failed to exercise prudence in coming to their decision to eliminate the Nabisco Funds from the Plan.” Id. at 682.
C.
Despite these extensive factual findings, RJR contends that it did not breach its duty of procedural prudence and that the district court too rigorously scrutinized its procedural process in so holding. We cannot agree.
As a threshold matter, RJR provides no basis for this court to question the district court’s well-supported factual finding that RJR failed to present evidence of “any process by which fiduciaries investigated, analyzed, or considered the circumstances regarding the Nabisco stocks and whether it was appropriate to divest.” Id. at 679 (emphasis added). By conducting no investigation, analysis, or review of the circumstances surrounding the divestment, RJR acted with procedural imprudence no matter what level of scrutiny is applied to its actions.
Instead of grappling with its failure to conduct any investigation, RJR urges us to hold that it did not breach its duty of procedural prudence because certain types of investment decisions assertedly trigger a lesser standard of procedural prudence. Thus, RJR contends that “[n]on-employer, single stock funds are imprudent per se ” due to their inherent risk. Appellee’s Br. 35.[8] But this per se approach is directly at odds with our case law and federal regulations interpreting ERISA’s duty of prudence. See DiFelice, 497 F.3d at 420 (explaining that, in all cases, evaluating the prudence of an investment decision requires a totality-of-the-eircumstances inquiry that takes into account “the character and aim of the particular plan and decision at issue and the circumstances prevailing at the time” (internal quotation marks omitted)); 29 C.F.R. § 2550.404a-1(b)(1) (stressing the importance of a totality-of-the-eircumstanees inquiry). Indeed, in promulgating its regulations, the Department of Labor expressly rejected the suggestion that a particular investment can be deemed per se prudent or per se imprudent based on its level of risk. See Investment of Plan Assets under the “Prudence” Rule, 44 Fed.Reg. 37,221, 37,225 (June 26, 1979); see also id. at 37,224-25 (declining to create “any list of investments, classes of investment, or investment techniques” deemed permissible or impermissible under the prudence rule).
Nor is there any merit to RJR’s contention that its decision to sell the employees’ Nabisco shares merits less scrutiny because that decision was assertedly made “in the face of financial trouble” to “protect[] participants and advance[ ] a fiduciary’s duty to ‘minimize the risk of large losses.’ ” Appellee’s Br. 34 (citation omitted). To adopt this argument, we would have to ignore the findings of the district *361 court as to the actual context in which RJR acted.
The court found that, without undertaking any investigation, RJR forced the sale, within an arbitrary timeframe, of funds in which Plan participants had already invested. The court found that RJR adhered to that decision in the face of sharply declining share prices and despite contemporaneous analyst reports projecting the future growth of those share prices and “overwhelmingly” recommending that investors “buy” or at least “hold” Nabisco stocks. The court also found that RJR did so without consulting any experts, without considering that the Plan’s purpose was to provide for retirement savings, and without acknowledging that the spin-off was undertaken in large part to enhance the future value of the Nabisco stock by eliminating the tobacco taint.
The district court further found that RJR sold the Nabisco funds when it did because of its fear of liability, not out of concern for its employees’ best interests. RJR blinks at reality in maintaining that its actions served to “protect[] participants” or to “minimize the risk of large losses.” To the contrary, RJR’s decision to force the sale of its employees’ shares of Nabisco stock, within an arbitrary time-frame and irrespective of the prevailing circumstances, ensured immediate and permanent losses to the Plan and its beneficiaries.
In sum, in support of its holding that RJR breached its duty of procedural prudence, the district court made extensive and careful factual findings, all of which were well supported by the record evidence. RJR’s challenge to those findings fails.
IV.
We next address the district court’s holding with respect to which party bears the burden of proof as to loss causation. A breach of fiduciary duty “does not automatically equate to causation of loss and therefore liability.” Plasterers’, 663 F.3d at 217. ERISA provides that a fiduciary who breaches its duties “shall be personally liable” for “any losses to the plan resulting from each such breach.” Id. (quoting 29 U.S.C. § 1109(a)). Accordingly, in Plasterers’, we adopted the Seventh Circuit’s reasoning that “[i]f trustees act imprudently, but not dishonestly, they should not have to pay a monetary penalty for their imprudent judgment so long as it does not result in a loss to the Fund.” Id. (emphasis added) (quoting Brock v. Robbins, 830 F.2d 640, 647 (7th Cir.1987)). We cautioned, however, that “imprudent conduct will usually result in a loss to the fund, a loss for which [the fiduciary] will be monetarily penalized.” Id. at 218 (quoting Brock, 830 F.2d at 647). But in Plasterers’ we did not need to answer the question of which party bore the burden of proof on loss causation.
In this case, the district court had to resolve that question. The court held that the burden of both production and persuasion rested on RJR at this stage of the proceedings. The court explained that “once Tatum made a showing that there was a breach of fiduciary duty and some sort of loss to the plan, RJR assumed the burden (that is, the burden of production and persuasion) to show that the decision to remove the Nabisco stock from the plan was objectively prudent.” Tatum, 926 F.Supp.2d at 683.[9] RJR contends that in doing so, the court erred. We disagree.
*362 Generally, of course, when a statute is silent, the default rule provides that the burden of proof rests with the plaintiff. Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 56, 126 S.Ct. 528, 168 L.Ed.2d 387 (2005). But “[t]he ordinary default rule ... admits of exceptions,” id. at 57, 126 S.Ct. 528, and one such exception arises under the common law of trusts. “[I]n matters of causation, when a beneficiary has succeeded in proving that the trustee has committed a breach of trust and that a related loss has occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach.” Restatement (Third) of Trusts § 100, cmt. f (2012) (internal citation omitted); see also Bogert & Bogert, The Law of Trusts and Trustees § 871 (2d rev. ed. 1995 & Supp.2013) (“If the beneficiary makes a prima facie case, the burden of contradicting it ... will shift to the trustee.”).
The district court adopted this well-established approach. It reasoned that requiring the defendant-fiduciary, here RJR, to bear the burden of proof was the “most fair” approach “considering that a causation analysis would only follow a finding of [fiduciary] breach.” Tatum, 926 F.Supp.2d at 684; see also Roth, 16 F.3d at 917 (stating that once the ERISA plaintiff meets this burden, “the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by ... the breach of duty.” (alteration in original) (internal quotation marks omitted)); McDonald v. Provident Indem. Life Ins. Co., 60 F.3d 234, 237 (5th Cir.1995); cf. Sec’y of U.S. Dep’t of Labor v. Gilley, 290 F.3d 827, 830 (6th Cir.2002) (placing the burden of proof on the defendant-fiduciary to disprove damages); N.Y. State Teamsters Council v. Estate of DePemo, 18 F.3d 179, 182-83 (2d Cir.1994) (same).[10]
We have previously recognized the burden-shifting framework in an analogous context. In Brink v. DaLesio, 667 F.2d 420 (4th Cir.1982), modified and superseded on denial ofreh’g, (1982), we considered the impact of a breach of fiduciary duty *363 under the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 501. We explained that “[i]t is generally recognized that one who acts in violation of his fiduciary duty bears the burden of showing that he acted fairly and reasonably.” Id. at 426. Thus, we held that the district court in that case had erred when, after finding that the defendant breached his fiduciary duty, it placed the burden on the plaintiffs to prove what, if any, damages were attributable to that breach. Id.[11]
Moreover, this burden-shifting framework comports with the structure and purpose of ERISA. As stated in its preamble, the statute’s primary objective is to protect “the interests of participants in employee benefit plans and their beneficiaries.” 29 U.S.C. § 1001(b). To achieve this purpose, ERISA imposes fiduciary obligations on those responsible for administering employee benefit plans and plan assets, and provides for enforcement through “appropriate remedies, sanctions, and ready access to the Federal courts.” Id. As amicus Secretary of Labor notes, “[fimposing on plaintiffs who have established a fiduciary breach and a prima facie case of loss the burden of showing that the loss would not have occurred in the absence of a breach would create significant barriers for those (including the Secretary) who seek relief for fiduciary breaches.” Amicus Br. of Sec’y of Labor 19-20. Such an approach would “provide an unfair advantage to a defendant who has already been shown to have engaged in wrongful conduct, minimizing the fiduciary provisions’ deterrent effect.” Id. at 20.
In sum, the long-recognized trust law principle — that once a fiduciary is shown to have breached his fiduciary duty and a loss is established, he bears the burden of proof on loss causation — applies here. Overwhelming evidence supported the district court’s finding that RJR breached its fiduciary duty to act prudently and that this breach resulted in a prima facie showing of loss to the Plan. Thus, the court did not err in requiring RJR to prove that its imprudent decision-making did not cause the Plan’s loss. Accordingly, we turn to the question of whether the district court correctly held that RJR carried its burden of proof on causation.
V.
To carry its burden, RJR had to prove that despite its imprudent decision-making process, its ultimate investment decision was “objectively prudent.” Because the term “objective prudence” is not self-defining, in Plasterers’, we turned to the standard set forth by our sister circuits. Thus, we explained that a decision is “objectively prudent” if “a hypothetical prudent fiduciary would have made the same decision anyway.” 663 F.3d at 218 (quoting Roth, 16 F.3d at 919) (emphasis added); see also Peabody v. Davis, 636 F.3d 368, 375 (7th Cir.2011); Bussian, 223 *364 F.3d at 300; In re Unisys Sav. Plan Litig., 173 F.3d 145, 153-54 (3d Cir.1999). Under this standard, a plaintiff who has proved the defendant-fiduciary's procedural imprudence and a prima facie loss prevails unless the defendant-fiduciary can show, by a preponderance of the evidence, that a prudent fiduciary would have made the same decision. Put another way, a plan fiduciary carries its burden by demonstrating that it would have reached the same decision had it undertaken a proper investigation.
Somewhat surprisingly, the dissent accuses us of concocting a new standard for loss causation, never adopted in Plasterers’. We cannot agree. We are simply applying the standard set forth by this court in Plasterers’, a case on which the dissent itself heavily relies. The dissent’s claim that Plasterers’ decided nothing more than that “causation of loss is not an axiomatic conclusion that flows from a breach” is baseless. For in Plasterers’, immediately after recognizing that the district court had been “without the benefit of specific circuit guidance on this issue,” 663 F.3d at 218 n. 9, we stated what loss causation means. Thus, we then explained: “Even if a trustee failed to conduct an investigation before making a decision, he is insulated from liability [under § 1109(a) ] if a hypothetical prudent fiduciary would have made the same decision anyway.” Id. at 218 (quoting Roth, 16 F.3d at 919). This language would serve no purpose in the opinion if not to instruct the district court regarding the proper analysis on remand.[12]
The district court properly acknowledged the “would have” standard that we and our sister circuits have adopted. See Tatum, 926 F.Supp.2d at 683. But the court nonetheless applied a different standard. Thus, it required RJR to prove only that “a hypothetical prudent fiduciary could have decided to eliminate the Nabisco Funds on January 31, 2000.” Id. at 690 (emphasis added). The manner in which the district court evaluated the evidence unquestionably demonstrates that it indeed meant “could have” rather than “would have.” See, e.g., id. at 689 n. 29, 690. For instead of determining whether the evidence established that a prudent fiduciary, more likely than not, would have divested the Nabisco Funds at the time and in the manner in which RJR did, the court concluded that the evidence did not “compel a decision to maintain the Nabisco Funds in the Plan,” and that a prudent investor “could [have] inferred]” that it was prudent to sell. Id. at 686 (emphasis added).[13]
*365 RJR recognizes that the district court applied a “could have” standard, but argues that this is the proper standard for determining whether its divestment decision was objectively prudent. Alternatively, RJR maintains that, even if the district court erred in applying the “could have” rather than “would have” standard, the error was harmless. We address these arguments in turn.
A.
RJR acknowledges that the causation inquiry requires a finding of objective prudence. But it contends that a court measures a fiduciary’s objective prudence by determining whether its “decision, when viewed objectively, is one a hypothetical prudent fiduciary could have made.” Appellee’s Br. 16 (emphasis added).
But we, like our sister circuits, have adopted the “would have” standard to determine a fiduciary’s objective prudence. As the Supreme Court has explained, the distinction between “would” and “could” is both real and legally significant. See Knight v. Comm’r, 552 U.S. 181, 187-88, 192, 128 S.Ct. 782, 169 L.Ed.2d 652 (2008). In opining that this distinction is simply “semantics at its worst,” the dissent ignores Knight. There, the Court instructed that “could” describes what is merely possible, while “would” describes what is probable. Id. at 192, 128 S.Ct. 782. “[Djetermining what would happen if a fact were changed ... necessarily entails a prediction; and predictions are based on what would customarily or commonly occur.” Id. (emphasis added). Inquiring what could have occurred, by contrast, spans a much broader range of decisions, encompassing even the most remote of possibilities. See id. at 188, 128 S.Ct. 782 (“The fact that an individual could ... do something is one reason he would ..., but not the only possible reason.”).
The “would have” standard is, of course, more difficult for a defendant-fiduciary to satisfy. And that is the intended result. “Courts do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same.” In re Beck Indus., Inc., 605 F.2d 624, 636 (2d Cir.1979). ERISA’s statutory scheme is premised on the recognition that “imprudent conduct will usually result in a loss to the fund, a loss for which [the fiduciary] will be monetarily penalized.” Plasterers’, 663 F.3d at 218 (quoting Brock, 830 F.2d at 647). We would diminish ERISA’s enforcement provision to an empty shell if we permitted a breaching fiduciary to escape liability by showing nothing more than the mere possibility that a prudent fiduciary “could have” made the same decision. As the Secretary of Labor notes, this approach would “create[] too low a bar, allowing breaching fiduciaries to avoid financial liability based on even remote possibilities.” Amicus Br. *366 of Sec’y of Labor 23.[14]
To support its contrary argument, RJR heavily relies on then-Judge Scalia’s concurrence in Fink v. Nat’l Sav. & Trust Co., 772 F.2d 951 (D.C.Cir.1985), in which he states:
I know of no case in which a trustee who has happened — through prayer, astrology or just blind luck — to make (or hold) objectively prudent investments ... has been held liable for losses from those investments because of his failure to investigate or evaluate beforehand.
Id. at 962 (Scalia, J., concurring in part and dissenting in part). But, despite the protestations of RJR and the dissent, this observation is entirely consistent with the “would have” standard we adopted in Plasterers’. It is simply another way of saying the same thing: that a fiduciary who fails to “investigate and evaluate beforehand” will not be found to have caused a loss if the fiduciary would have made the same decision if he had “investigated] and evaluated] beforehand.” Id. Stated yet another way, the inquiry is whether the loss would have occurred regardless of the fiduciary’s imprudence.
Of course, intuition suggests, and a review of the case law confirms, that while such “blind luck” is possible, it is rare. When a plaintiff has established a fiduciary breach and a loss, courts tend to conclude that the breaching fiduciary was liable. See Peabody, 636 F.3d at 375; Allison v. Bank One-Denver, 289 F.3d 1223, 1239 (10th Cir.2002); Meyer v. Berkshire Life Ins. Co., 250 F.Supp.2d 544, 571 (D.Md.2003), aff'd, 372 F.3d 261, 267 (4th Cir.2004); cf. Chao v. Hall Holding Co., 285 F.3d 415, 434, 437-39 (6th Cir.2002); Donovan v. Cunningham, 716 F.2d 1455, 1476 (5th Cir.1983). As explained above, that is precisely the result anticipated by ERISA’s statutory scheme.
B.
Alternatively, RJR maintains that, even if the district court erred in applying the “could have” rather than “would have” standard, the error was harmless. This is so, in RJR’s view, because the facts found by the district court as to the high-risk nature of the Nabisco Funds unquestionably establish that a prudent fiduciary would have eliminated them from the Plan. Appellee’s Br. 20. This argument also fails.
Although risk is a relevant consideration in evaluating a divestment decision, risk cannot in and of itself establish that a fiduciary’s decision was objectively prudent. Indeed, in promulgating the regulations governing ERISA fiduciary duties, the Department of Labor expressly rejected such an approach. In its Preamble to Rules and Regulations for Fiduciary Responsibility, the Department explained, as we noted above, that “the risk level of an *367 investment does not alone make the investment per se prudent or per se imprudent.” Investment of Plan Assets under the “Prudence” Rule, 44 Fed.Reg. 37,221, 37,225 (June 26, 1979). Moreover, the Department instructed that:
an investment reasonably designed — as part of a portfolio — to further the purposes of the plan, and that is made upon appropriate consideration of the surrounding facts and circumstances, should not be deemed to be imprudent merely because the investment, standing alone, would have, for example, a relatively high degree of risk.
Id. at 37,224 (emphasis added); see also Dudenhoeffer, 573 U.S. at -, 134 S.Ct. at 2471 (“Because the content of the duty of prudence turns on ‘the circumstances ... prevailing’ at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context specific.” (alteration in original)); DiFelice, 497 F.3d at 420 (holding that, when determining whether an ERISA fiduciary has acted prudently, a court must consider the “character and aim of the particular plan and decision at issue and the circumstances prevailing at the time”). In sum, while the presence of risk is a relevant consideration in determining whether to divest a fund held by an ERISA plan, it is not controlling. We must therefore reject RJR’s contention that it would necessarily be imprudent for a fiduciary to maintain an existing single-stock investment in a plan that, like the Plan at issue here, offers participants a diversified portfolio of investment options.
Moreover, we cannot hold that the district court’s error in adopting the “could have” standard was harmless when the governing Plan document required the Nabisco Funds to remain as frozen funds in the Plan. ERISA mandates that fiduciaries act “in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA].” 29 U.S.C. § 1104(a)(1)(D).[15] Accordingly, courts have found a breaching fiduciary’s failure to follow plan documents to be highly relevant in assessing loss causation. See Allison, 289 F.3d at 1239; Dardaganis, 889 F.2d at 1241.[16] Tatum stipulated at trial that he would not assert that RJR’s failure to adhere to the Plan’s terms rendered RJR automatically liable under § 1109(a). But he expressly preserved his argument that the Plan terms are “highly relevant” to the causation analysis and that “a prudent fiduciary would have taken [them] into account” in deciding whether to divest. Appellant’s Br. 28 n. 13; see also Mem. re: Legal Effect of Invalid Plan Amendment at 2, Tatum v. R.J. Reynolds Pension Inv. Comm. (2013)(No. 1:02-cv-00373-NCT- *368 LPA), ECF No. 365. Therefore, the district court erred by failing to factor into its causation analysis RJR’s lack of compliance with the governing Plan document.
For all of these reasons, after careful review of the record, we cannot hold that the district court’s application of the incorrect “could have” standard was harmless. Particularly given the extraordinary circumstances surrounding RJR’s decision to divest the Nabisco Funds, including the timing of the decision and the requirements of the governing Plan document, we must conclude that application of the incorrect legal standard may have influenced the court’s decision. Reversal is required when a district court has applied an “incorrect [legal] standard[ ]” that “may ... have influenced its ultimate conclusion.” See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).
The district court’s task on remand will be to review the evidence to determine whether RJR has met its burden of proving by a preponderance of the evidence that a prudent fiduciary would have made the same decision. See Plasterers’, 663 F.3d at 218.[17] In doing so, the court must consider all relevant evidence, including the timing of the divestment, as part of a totality-of-the-circumstances inquiry. See Dudenhoeffer, 573 U.S. at -, 134 S.Ct. at 2471; DiFelice, 497 F.3d at 420. Perhaps, after weighing all of the evidence, the district court will conclude that a prudent fiduciary would have sold employees’ existing investments at the time and in the manner RJR did because of the Funds’ high-risk nature, recent decline in value, and RJR’s interest in diversification. Or perhaps the court will instead conclude that a prudent fiduciary would not have done so, because freezing the Funds had already mitigated the risk and because divesting shares after they declined in value would amount to “selling low” despite Nabisco’s strong fundamentals and positive market outlook. In either case, the district court must reach its conclusion after applying the standard this court announced in Plasterers’ — that is, whether “a hypothetical prudent fiduciary would have made the same decision anyway.” 663 F.3d at 218 (quotation marks omitted) (emphasis added).
C.
Before concluding our discussion of loss causation, we must briefly address the dissent’s apparent misunderstanding of our holding, the facts found by the district court, and controlling legal principles.
The dissent repeatedly charges that we hold RJR “monetarily liable for objectively prudent investment decisions.” It further charges that we have “confuse[d] remedies” — claiming that fiduciaries who act with procedural imprudence should be released from their fiduciary duties but not held monetarily liable. These charges misstate our holding.
*369 Our decision is a modest one. We affirm the district court’s holdings that RJR breached its duty of procedural prudence and that a substantial loss occurred. We simply remand for the district court to determine whether, under the correct legal standard, RJR’s imprudence caused that loss. If the court determines that a fiduciary who conducted a proper investigation would have reached the same decision, RJR will escape all monetary liability, notwithstanding its procedural imprudence. But if the court concludes to the contrary, then- the law requires that RJR be held monetarily liable for the Plan’s loss. For, as noted above, Congress has expressly provided that a fiduciary “who breaches any of the ... duties imposed [by ERISA] shall be personally liable to make good to [the] plan any losses to the plan resulting from [the] breach.” 29 U.S.C. § 1109(a) (emphasis added).
Thus, contrary to the dissent’s rhetoric, nothing in our holding requires a fiduciary to “make a decision that in the light of hindsight proves best.” Instead, a fiduciary need only adhere to its ERISA duties to avoid liability. So long as a fiduciary undertakes a reasoned decision-making process, it need never fear monetary liability for an investment decision it determines to be in the beneficiaries’ best interest. This is so even if that investment decision yields an outcome that in hindsight proves, in the dissent’s language, less than “optimal.” Indeed, our holding, like ERISA’s statutory scheme, acknowledges the uncertainty of outcomes inherent in any investment decision. Precisely for this reason, ERISA requires fiduciaries to undertake a reasoned decision-making process prior to making such decisions. Only because RJR failed to do so here will it be monetarily liable under § 1109(a) for any losses caused by its imprudence.
The dissent paints RJR as a faultless victim that, after following a “prudent investment strategy” has fallen prey to “opportunistic litigation.” In the dissent’s view, we are “penalizing the RJR fiduciaries for doing nothing more than properly diversifying the plan.” But the district court’s well-supported factual findings establish that RJR did a good deal more (or, more precisely, a good deal less). It made a divestment decision that cost its employees millions of dollars with “virtually no discussion or analysis,” without consideration of any alternative strategy or consultation with any experts, and without considering “the purpose of the Plan, which was for long term retirement savings,” or “the purpose of the spin-off, which was, in large part, to allow the Nabisco stock a chance to recover from the tobacco taint and hopefully rise in value.” Tatum, 926 F.Supp.2d at 678-79. RJR carried out this decision by adhering to a timeline that was “chosen arbitrarily and with no research.” Id. at 679. And in doing so, RJR failed to act “solely in the interests of participants and beneficiaries” and instead “improperly considered its own potential liability.” Id. at 681. Indeed, the extent of procedural imprudence shown here appears to be unprecedented in a reported ERISA case.
The dissent eschews the loss-causation standard that this court articulated in Plasterers’, and would instead apply a new standard that it dubs “objective prudence simpliciter.” Because this standard is not self-defining (and the dissent does not attempt to define it) it is unclear how this standard would operate in practice. At times, the dissent’s analysis suggests that its “objective prudence simpliciter ” test is in fact a “could have” standard. But, of course, the application of a “could have” standard contravenes our instructions in Plasterers’ and elides the critical distinction between “could have” and “would *370 have” that the Supreme Court drew in Knight. Far from “fuss[ing]” over “semantics,” we are merely applying the law.
Moreover, the dissent fails to acknowledge the alarming consequences of its “objective prudence simpliciter” standard. Pursuant to this standard, ERISA’s protections would be effectively unenforceable any time a fiduciary invokes the talisman of “diversification.” Under the dissent’s reading of the statute, any decision assert-edly “made in the interest of diversifying plan assets” would be automatically deemed “objectively prudent.” This approach would put numerous investment decisions beyond the reach of ERISA’s fiduciary liability provision. As a result, in any case in which a fiduciary could claim that it acted in pursuit of diversification, ERISA would neither deter a fiduciary’s imprudent decision-making, nor provide a make-whole remedy for injured beneficiaries. Congress certainly did not intend this result when it expressly provided that a fiduciary who breaches “any” of its ERISA duties “shall be personally liable” for “any losses to the Plan resulting from [the] breach.” 29 U.S.C. § 1109(a).
The Department of Labor, the body Congress specially authorized to promulgate regulations interpreting ERISA, has expressly rejected the dissent’s approach. Thus, the Department explains that “the relative riskiness of a specific investment or investment course of action does not render such investment or investment course of action either per se prudent or per se imprudent.” 44 Fed.Reg. 37,221, 37,222. Rather, “the prudence of an investment decision should not be judged without regard to the role that the proposed investment or investment course of action plays within the overall plan portfolio.” Id. A court cannot, as the dissent does, impose its own construction of a statute instead of that of the agency that Congress has vested with authority to interpret and administer it. See Chevron v. Natural Res. Def. Council, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
By applying a new standard of its own making, by ignoring the command in § 1109(a), and by refusing to follow precedent or defer to appropriate regulations, it is the dissent who, in its words, employs “linguistic contortions” to “obfuscate rather than illuminate” the law and “overrid[e] the statute.” Unlike the dissent, we refuse to make up and then apply an approach, at odds with the law, that would render ERISA a nullity in the face of any after-the-fact diversification defense.
VI.
Finally, we address the district court’s orders dismissing the Benefits Committee and Investment Committee as defendants and denying Tatum leave to amend his complaint to name the individual committee members as defendants. We review the former de novo, Smith v. Sydnor, 184 F.3d 356, 360-61 (4th Cir.1999), and the latter for an abuse of discretion, Galustian v. Peter, 591 F.3d 724, 729 (4th Cir.2010).
A.
The court dismissed the Benefits Committee and Investment Committee as defendants because it concluded that “committees” are not “persons” capable of being sued under ERISA. That statute defines “person” to include “an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization.” 29 U.S.C. § 1002(9). The district court erred in reading this list as exhaustive. That the provision does not expressly list “committees” does not mean that committees cannot *371 be “persons who are fiduciaries” under ERISA.
We need look no further than the statute itself to conclude that a committee may be a proper defendant-fiduciary. ERISA provides that a “named fiduciary” is a “fiduciary who is named in the plan instrument.” Id. § 1102(a)(2). The statute requires that a plan document “provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan.” Id. § 1102(a)(1). This requirement ensures that “responsibility for managing and operating the [p]lan — and liability for mismanagement — are focused with a degree of certainty.” Birmingham v. SoGen-Swiss Int’l Corp. Ret. Plan, 718 F.2d 515, 522 (2d Cir.1983)(emphasis added). Here, the Committees are the only named fiduciaries in the governing Plan document. As such, these entities are proper defendants in a suit alleging breach of fiduciary duty with respect to the Plan. Accord H.R.Rep. No. 93-1280 (1974) (Conf.Rep.), reprinted in 1974 U.S.C.C.A.N. 5038, 5075-78 (noting that a board of trustees could be a plan fiduciary even though “board” is not expressly listed as “person” under ERISA).
Furthermore, Department of Labor regulations interpreting the statute clearly state that a committee may serve as the named fiduciary in a plan document. See 29 C.F.R. § 2509.75-5, at FR-1. And this and other courts have routinely found committees to be proper defendant-fiduciaries in ERISA suits. See, e.g., Harris v. Amgen, Inc., 573 F.3d 728, 737 (9th Cir.2009); In re Schering-Plough Corp. ERISA Litig., 420 F.3d 231, 233, 242 (3d Cir.2005); Dzinglski v. Weirton Steel Corp., 875 F.2d 1075, 1080 (4th Cir.1989). The district court’s contrary holding is at odds with the Department of Labor regulations and these cases.[18] Accordingly, we must reverse the court’s dismissal of the Benefits Committee and Investment Committee.
B.
After limitations had run, Tatum moved for leave to amend his first amended complaint to name the individual committee members. The court denied the motion on the ground that Tatum’s claims against the individual committee members did not “relate back” to those in his first amended complaint, and thus the statute of limitations barred suit against them.
As the district court correctly recognized, an amendment to add an additional party “relates back” when (1) the claim asserted in the proposed amendment arises out of the same conduct set forth in the original pleading, and (2) the party to be added (a) received timely notice of the action such that he would not be prejudiced in maintaining a defense on the merits, and (b) knew or should have known that he would have been named as defendant “but for a mistake concerning the proper party’s identity.” Fed.R.Civ.P. 15(c)(1). The district court concluded that the individual committee members were not on notice that they would have been named as defendants but for a mistake concerning their identity. The court did not abuse its discretion in so holding.
In both his original complaint and in his first amended complaint, Tatum named as defendants only RJR and the Committees. Tatum’s decision not to include as defen *372 dants the individual committee members reflected “a deliberate choice to sue one party instead of another while fully understanding the factual and legal differences between the two parties.” Krupski v. Costa Crociere S. p. A., 560 U.S. 538, 549, 130 S.Ct. 2485, 177 L.Ed.2d 48 (2010). This, the Supreme Court has explained, “is the antithesis of making a mistake concerning the proper party’s identity.” Id. Accordingly, the Court has held that Rule 15(c)’s requirements are not satisfied when, as here, “the original complaint and the plaintiffs conduct compel the conclusion that the failure to name the prospective defendant in the original complaint was the result of a fully informed decision.” Id. at 552, 130 S.Ct. 2485.
VII.
For the foregoing reasons, we affirm the district court’s holding that RJR breached its duty of procedural prudence and so carries the burden of proof on causation, but vacate the judgment in favor of RJR. We reverse the order dismissing the Benefits Committee and the Investment Committee as defendants, but affirm the order denying Tatum’s motion for leave to amend his complaint to add additional defendants. We remand the case for further proceedings consistent with this opinion.

AFFIRMED IN PART, VACATED IN PART, REVERSED IN PART, AND REMANDED.

. Thus, as a result of the spin-off, there were two funds holding exclusively Nabisco stock: the Nabisco Common Stock Fund, which existed prior to the spin-off, and the Nabisco Group Holdings Common Stock Fund, which was created as a result of the spin-off. We refer to these two funds collectively as the "Nabisco Funds.”

. In November 1999, Gordon drafted a purported amendment to the Plan calling for the removal of Nabisco Funds from the Plan as of February 1, 2000. Because a majority of the Benefits Committee members neither voted on nor signed this amendment, the district court found it invalid. Id. at 674 n. 19. No party challenges this ruling on appeal.

. Apparently, no meeting attendee knew how many employees had already sold their shares of the Nabisco Funds. Following the meeting, RJR ascertained that the number of participants in each of the Nabisco Funds had decreased by approximately 15-16% as of September 30, 1999. Id. at 662. Thus, at the time the attendees considered whether to change course, the vast majority of employees still retained their shares in the Nabisco Funds.

. Shortly thereafter, the district court certified a class of Plan participants and beneficiaries whose investments in the Nabisco Funds were sold by RJR in connection with the spinoff. See Tatum v. R.J. Reynolds Tobacco Co., 254 F.R.D. 59, 62 (M.D.N.C.2008). On appeal, RJR raises no challenge to this certification.

. See H.R.Rep. No. 93-1280 (1974) (Conf. Rep.), reprinted at 1974 U.S.C.C.A.N. 5038, 5085-86 (clarifying that, in plans in which the participant exercises individual control over the assets in his individual account — like the plan at issue here — “if the participant instructs the plan trustee to invest the full bal-anee of his account in, e.g., a single stock, the trustee is not to be liable for any loss because of a failure to diversify or because the investment does not meet the prudent man standards” so long as the investment does not "contradict the terms of the plan”); see also 29 C.F.R. § 2550.404c-l(f)(5).

. We can quickly dispose of RJR’s claim that it was not a fiduciary subject to ERISA's duty of prudence. RJR argues that the Plan fiduciaries, the Benefits Committee and the Investment Committee, exercised "exclusive fiduciary authority” over the management and administration of the Plan and that RJR qua employer is thus not liable as a Plan fiduciary. Appellee’s Br. 49. ERISA, however, does not limit fiduciary status to the fiduciaries named in a plan document. Instead, ERISA provides that a person or entity is a "functional fiduciary” to the extent that he, she, or it “exercises any discretionary authority or discretionary control respecting management ... or disposition of [the plan's] assets.” 29 U.S.C. § 1002(21)(A) (emphasis added). Recognizing this standard, the district court held that RJR "made and implemented the elimination decision before any official com *358 mittee action was ever attempted and failed to use the committees designated in the Plan ... for any of the discretionary decisions.” Tatum, 926 F.Supp.2d at 672 n. 18. Thus, we think it clear that RJR exercised actual control over the management and disposition of Plan assets, and so acted as a functional fiduciary.

. By contrast, courts have found that a fiduciary’s failure to act in accordance with plan documents serves as evidence of imprudent conduct—in addition to independently violating Subsection (D) of § 1104(a)(1)—so long as the plan documents are consistent with ERISA’s requirements. See, e.g., Dardaganis v. Grace Capital, Inc., 889 F.2d 1237, 1241 (2d Cir.1989).

. We note that at the time plan participants purchased shares of the Nabisco Funds through the Plan, they were indeed employer funds.

. Thus, contraiy to RJR's passing comment on appeal, see Appellee's Br. 22 n. 4, the district court did find that Tatum made a prima facie showing of loss. Moreover, no party disputes that, on January 31, 2000, *362 when RJR sold all of the Plan's Nabisco stock, that stock’s value was at an all-time low.

. None of the cases RJR and the dissent cite to support their contrary view persuade us that the district court erred. See Silverman v. Mut. Benefit Life Ins. Co., 138 F.3d 98, 105 (2d Cir.1998); Kuper v. Iovenko, 66 F.3d 1447, 1459 (6th Cir.1995), abrogated by Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. -, 134 S.Ct. 2459, 189 L.Ed. 457 (2014); Willett v. Blue Cross & Blue Shield of Ala., 953 F.2d 1335, 1343 (11th Cir.1992). Neither Kuper nor Willett addressed a situation in which plaintiffs had already established both fiduciary breach and a loss. Moreover, in Silver-man, the decision not to shift the burden of proof was based in large part on the unique nature of a co-fiduciary’s liability under § 1105(a)(3). See 138 F.3d at 106 (Jacobs, J„ concurring). That reasoning does not apply to the present case, in which plan participants sued under § 1104(a)(1) and alleged losses directly linked to the defendant-fiduciary’s own fiduciary breach. Nor does it appear that the Second Circuit would apply the Sil-verman reasoning to a case brought under § 1104(a). See N.Y. State Teamsters Council, 18 F.3d at 182, 182-83 (acknowledging "the general rule that a plaintiff bears the burden of proving the fact of damages” but concluding in an ERISA case that "once the beneficiaries have established their prima facie case by demonstrating the trustees' breach of fiduciary duty, the burden of explanation or justification shifts to the fiduciaries” (internal quotation marks and alterations omitted)). Furthermore, Willett, which the dissent quotes at length, actually undercuts its position. There the court held that the burden of proof remained with the plaintiff, prior to establishing breach, but that "in order to prevail as a matter of law,” it was the defendant-fiduciary who had to "establish the absence of causation by proving that the beneficiaries’ claimed losses could not have resulted from [defendant-fiduciaiy’s] failure to cure [the co-fiduciary’s] breach.” 953 F.2d at 1343 (emphasis added).

. RJR and the dissent suggest that our holding in U.S. Life Insurance Co. v. Mechanics & Farmers Bank, 685 F.2d 887 (4th Cir.1982), supports their view that RJR did not bear the burden of proof. They contend that in U.S. Life, we held that "placing the burden of proof on a plaintiff [here Tatum] to prove causation is supported by trust law.” Appel-lee’s Br. 21. But, in fact, in U.S. Life, we dealt with the unique situation in which a trustee breached the terms of an indenture agreement and so assertedly violated state contract law. 685 F.2d at 889. Because the parties' relationship was principally contractual in nature (a critical fact that both RJR and the dissent ignore), we declined to apply a burden-shifting framework in what we held was, in essence, a "typical breach of contract type of case.” Id. at 896. Here, by contrast, ERISA — not a contract — governs the parties’ relationship, and expressly imposes fiduciary — not contractual — duties. Thus, U.S. Life offers no support to RJR and the dissent.

. Moreover, the dissent is simply mistaken in contending that the standard applicable for loss causation "was not discussed, was not briefed, and was not before the court” in Plasterers’. In urging the court to adopt the loss causation requirement, the appellants' brief in Plasterers’ cited the language from then-Judge Scalia's concurrence in Fink v. Nat’l Sav. & Trust Co., 772 F.2d 951, 962 (D.C.Cir.1985), see infra at 40, and then recognized that:
The Eighth Circuit's formulation of the rule [of loss causation in Roth ] is more common, if less colorful: "Even if a trustee failed to conduct an investigation before making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway.” This rule follows directly from § 409 of ERISA, which provides that fiduciaries are liable only for "losses to the plan resulting from ... a breach.”
Br. of Appellants 21-22, Plasterers', 663 F.3d 210 (emphasis added) (citations omitted). Thus, both the loss causation requirement and the standard used to define it were indeed discussed, briefed, and before the court in Plasterers’.

. For this analysis, the court relied on Kuper v. Quantum Chemicals Corp., 852 F.Supp. 1389, 1395 (S.D.Ohio 1994), aff'd sub nom. Kuper v. Iovenko, 66 F.3d at 1447. But Kuper *365 is inapposite because it applied a presumption of reasonableness to a fiduciary's decision to retain company stock, a presumption that plaintiffs failed to rebut by establishing breach of fiduciary duty. See 66 F.3d at 1459. We have never applied this presumption, and the Supreme Court has recently clarified that ERISA contains no such presumption. See Dudenhoeffer, 573 U.S. at -, 134 S.Ct. at 2463. Moreover, this case differs from Kuper in two critical respects. First, Tatum challenges the divestment of stock, while Kuper involved a challenge to the retention of stock. Second, Tatum has established that RJR breached its fiduciary duty; Kuper never established this. Notably, the Sixth Circuit, which decided Kuper, has since expressly recognized, at least with respect to the amount of damages, that when a fiduciary breach is established, "uncertainty should be resolved against the breaching fiduciary.” Gilley, 290 F.3d at 830 (emphasis added).

. Moreover, notwithstanding the suggestion of RJR and the dissent, the Supreme Court in Dudenhoeffer did not hold that the "could have” standard applies in determining whether a trustee, like RJR, who has utterly failed in its duty of procedural prudence, has nonetheless acted in an objectively prudent manner and so not caused loss to the plan. Rather, Dudenhoeffer addressed an allegation that a fiduciary failed to act on insider information. In this very different context, the Court held that when "faced with such claims,” courts should "consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant’s position could not have concluded that [acting on insider information] would do more harm than good.” Dudenhoeffer, 573 U.S. at -, 134 S.Ct. at 2473 (emphasis added). The Court's use of "could not have” in this limited context does not cast doubt on our instruction that a “would have” standard applies to determine loss causation after a fiduciary breach has been established.

. On appeal, RJR suggests that following the Plan terms would have been inconsistent with ERISA. Specifically, RJR asserts that if it had maintained the Nabisco Funds as frozen funds after the spin-off, it would have violated ERISA’s requirement that fiduciaries "diversify!] investments of the plan so as to minimize the risk of large losses.” Id. § 1104(a)(1)(C). Thus, RJR argues that it "was required to divest the Nabisco Funds from the Plan.” Appellee’s Br. 27. Before the district court, however, RJR properly "admitted] that there are no regulations prohibiting single stock funds of any kind in an ERISA plan.” Tatum, 926 F.Supp.2d at 681. See supra note 5; see also H.R.Rep. No. 93-1280, reprinted at 1974 U.S.C.C.A.N. 5038, 5084-85 (explaining that whether a fiduciary’s investment of plan assets violates the diversification duty depends on the "facts and circumstances of each case”).

. Of course, this does not mean, as the dissent suggests, that plan terms trump the duty of prudence. It simply means that plan terms, and the fiduciary’s lack of compliance with those terms, inform a court’s inquiry as to how a prudent fiduciary would act under the circumstances.

. In evaluating the evidence, the district court abused its discretion to the extent it refused to consider the testimony of one of Tatum’s experts, Professor Lys, regarding what a prudent investor would have done under the circumstances. Even though Professor Lys lacked expertise as to the specific requirements of ERISA, his testimony was relevant as to what constituted a prudent investment decision. See Plasterers’, 663 F.3d at 218; see also Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir.2009) ("A fiduciary must behave like a prudent investor under similar circumstances.... ”); Katsaros v. Cody, 744 F.2d 270, 279-80 (2d Cir.1984) (noting that an investment expert’s lack of experience with pension fund management did not affect his qualifications to testify as to what constituted a prudent investment decision in an ERISA case). On remand, the court should consider this with all other relevant evidence.

. To the extent there is any ambiguity in the relevant provisions, we conclude that in interpreting the word "person” and its corresponding definition at 29 U.S.C. § 1002(9), we should take into account "Congress's broad remedial goals,” In re Beacon Assocs. Litig., 818 F.Supp.2d 697, 706 (S.D.N.Y.2011), which is consistent with our holding that "committees” are proper defendant-fiduciaries in ERISA suits.