DIAZ, Circuit Judge,
dissenting:
I.
The last time this case was before us we said that “[t]he district court’s task on remand will be to review the evidence to determine whether RJR has met its burden of proving by a preponderance of the evidence that a prudent fiduciary would have made the same decision.” Tatum v. RJR Pension Inv. Comm. (Tatum TV), 761 F.3d 346, 368 (4th Cir. 2014). Though “we expressed no opinion as to the proper outcome of the case,” Majority Op. at 556, we did give specific instructions for adhering to our mandate. Among other things, we directed the district court to “consider all relevant evidence, including the timing of the divestment, as part of a totality-of-the-circumstances inquiry.” Tatum TV, 761 F.3d at 368. We also said that “the district court erred by failing to factor into its causation analysis RJR’s lack of compliance with the governing Plan document,” which “required the Nabisco Funds to remain as frozen funds in the Plan.” Id. at 367-68.
Simply put, the district court did not adhere to our mandate. In particular, the court failed to explain whether a hypothetical prudent fiduciary would have made the same decisions that RJR did with respect to the timing of the divestment and the fiduciary’s disregard for the governing Plan document, both of which we described in our previous opinion as “extraordinary circumstances.” Id. at 368.
I respectfully dissent.
II.
A.
1.
I begin with the timing of RJR’s divestment of the Nabisco Funds. As my colleagues note, “RJR informed Plan participants that the Nabisco Funds would be frozen on the date of the spin-off and divested within six months.” Majority Op. at 556 (citing Tatum v. R.J. Reynolds Tobacco Co. (Tatum V), No. 1:02-cv-00373, 2016 WL 660902, at *5 (M.D.N.C. Feb. 18, 2016)). Because the timing issue is so important to this case, it’s worth recounting the surrounding facts in more detail.
*569 A “working group” of RJR employees made the initial decision to divest the Nabisco Funds at a March 1999 meeting. Tatum IV, 761 F.3d at 352. But it had no authority to do so. Id. “According to testimony from members of the working group, the group spent only thirty to sixty minutes considering what to do with the Nabisco Funds in RJR’s 401(k) plan.” Id. With regard to the timeline for divesting, a member of the working group testified that “[t]here was a general discussion, and different ideas were thrown out, would three months be appropriate, would a year be appropriate, and everybody got very comfortable with six months,” though the group did not choose a particular date. Tatum V, 2016 WL 660902, at *4. The “rationale for” the divestment timeline was “to give employees notice and allow them to reallocate their funds.” Id. at *26.
The working group’s recommendation to divest in approximately six months was reported back to different RJR executives, each of whom agreed with the group’s proposed timeline. Months passed, the spin-off occurred on June 14, 1999, and Nabisco’s stock “declined precipitously in value.” Tatum IV, 761 F.3d at 353. Then, in October 1999, RJR executives “met to discuss possible reconsideration of the decision made by the working group in March to sell the Nabisco Funds.” Id. “They decided against changing course, however, largely because they feared doing so would expose RJR to liability from employees who had already sold their shares of the Nabisco Funds in reliance on RJR’s prior communications.” Id. Ultimately they chose January 31, 2000, as the day on which divestment would occur because “[t]he closest month-end after the six-month freeze period announced on June. 14, 1999, would have been December 31, 1999,” and they were concerned that “potentially widespread computer problems (“Y2K”) ... could interfere with the liquidation of the” Nabisco Funds. Tatum V, 2016 WL 660902, at *8.
2.
To adhere to the mandate, the district court needed to determine- whether a hypothetical prudent fiduciary would have divested on the same timeline as the one described above. The court correctly recognized that its inquiry was twofold:
(1) whether a fiduciary who properly investigated the prudence of divesting the Nabisco Funds would have made the decision that the Nabisco Funds be removed from the Plan approximately six months after the spin-off and (2) whether a fiduciary, having chosen to divest the Nabisco Funds in six months, under -the duty to continually monitor the prudence of the divestment decision, would have decided to go forward with the divestment as planned in light of any changes to be considered.
Id. at *26.
Yet, in addressing the first stage of the inquiry, the district court failed to apply these standards. After reiterating its prior finding that “the timeline for divestment was ... chosen arbitrarily and with no research other than asking those at the meeting their own experience with single stock funds,” the district court nonetheless determined that “once the decision was made to divest the stock; six months was a period long enough to give notice to all plan participants and coordinate the process of divestment.” Id. (internal quotation marks omitted). “Thus,” the court concluded, “RJR’s six month time frame ... was indeed within a reasonable time frame.” Id. In support of this conclusion, the court referenced its findings of fact that “[e]x-perts for both sides ... agreed that once the decision to divest was made, a period long enough to give notice to all plan participants” and otherwise effectuate the di *570 vestment’s procedures “would be less than a year,” and that “once a decision is made to eliminate an investment option in the future, a minimum of six months is needed to allow participants the opportunity to reallocate their investments.” Id. at *23 (internal quotation marks omitted).
That analysis doesn’t adhere to the mandate for two reasons. First, the district court’s analysis of the first prong of its inquiry relies entirely on the unsupported assumption that the time required to complete a divestment is the only factor relevant to choosing a divestment’s timeline— the court discusses no other factors. See id. at *26. Similarly, the only rationale that the court found for the March 1999 working group’s decision was to give employees notice and an opportunity to exit the fund at any time. Id. at *4, *26.
The court’s approach also implies that other factors, including the urgency with which divestment needs to occur and the underlying reasons for divesting, are not relevant to a prudent fiduciary’s calculus. That doesn’t square with our reasoning in Tatum IV. There, we affirmed the district court’s previous holding that RJR breached its duty of procedural prudence based in part upon the court’s finding that the March 1999 working group did not consider “maintaining the stock in a frozen fund indefinitely, making the timeliné for divestment longer, ... any other strategy to minimize a potential immediate loss to participants or any potential opportunity for gain,” or “the purpose of the spin-off.” Tatum IV, 761 F.3d at 359-61 (quoting Tatum v. R.J. Reynolds Tobacco Co. (Tatum III), 926 F.Supp.2d 648, 678, 680 (M.D.N.C. 2013)).
On remand, however, the district court effectively started from the premise that a hypothetical prudent fiduciary would have used the same analytical process as these imprudent fiduciaries, and then worked backwards from there to justify the imprudent fiduciaries’ choice as a reasonable one. That’s different from showing why a hypothetical prudent fiduciary conducting an independent analysis would have arrived at the same decision.
Second, the district court failed again to answer the question (which it restated verbatim) whether a hypothetical prudent fiduciary would have decided to divest approximately six months after the spin-off. And, of course, the divestment timeline is one of the “extraordinary circumstances” of this case. Id. at 368.[1] Instead, the district court answered the question we rejected in Tatum IV — whether a hypothetical fiduciary could have decided to divest approximately six months after the spinoff. Cf. id. at 365 (“We would diminish ERISA’s enforcement provision to an empty shell if we permitted a breaching fiduciary to escape liability by showing nothing more than the mere possibility that a prudent fiduciary ‘could have’ made the same decision.”). The district court said that “six months was a period long enough to give notice to all plan participants and coordinate the process of divestment,” and that the “six month time frame ... was indeed within a reasonable time frame.” Tatum V, 2016 WL 660902, at *26 (emphasis added). This language — “within a reasonable time frame” and “long enough” — smacks of “could have” rather than “would have.”
And finally, if there were any doubt, one need only look to the evidence that the *571 district court pointed to in support of its “would have” conclusion. It identified a lower bound for how long a plan participant needed to reallocate funds (six months) and a length of time universally agreed upon as sufficient to effectuate a divestment (one year). Id. at *23. Then, relying only on the former, the court concluded that six months was “long enough.” Id. at *26. But absent a finding that the divestment timeline needed to be as short as possible, it makes no sense to come to a conclusion about what someone would have done based upon how quickly someone could have done it.
. In short, we directed the district court on remand to answer the question whether a hypothetical prudent fiduciary would have decided to divest approximately six months after the spin-off. Regrettably, the court again answered the question we rejected — whether a hypothetical fiduciary could have done as RJR did.
B.
With respect to RJR’s lack of compliance with the governing Plan document, to adhere to our mandate the district court needed to answer the question whether a hypothetical prudent fiduciary faced with the same governing Plan document would have ignored its language. See Tatum IV, 761 F.3d at 367. As my colleagues note, “[i]n November [1999], RJR attempted to amend the Plan documents to indicate that the Plan would no longer offer the Nabisco Funds.” Majority Op. at 557. RJR did not properly ratify the amendment (the “November Amendment”), however, “rendering it void.” Id. at 557 n.1. “Thus, at the time of the divestment, the Plan documents required that the Nabisco Funds remain frozen.” Id.; see also Tatum IV, 761 F.3d at 353 n.2 (“No party challenges th[e] ruling [that the November Amendment was invalid] on appeal”). >
In its opinion, the district court began the section titled “Requirements of Plan Documents” by acknowledging that the Plan documents required that the Nabisco Funds remain frozen and that we “found that it was error for [the district court] not to ‘factor into its causation analysis RJR’s lack of compliance with the governing Plan document.’ ” Tatum V, 2016 WL 660902, at *24 (quoting Tatum IV, 761 F.3d at 368). By “causation analysis,” we referred to “objective prudence,” which exists “if a hypothetical prudent fiduciary would have made the same decision.” Tatum IV, 761 F.3d at 364 (internal quotation marks omitted).
Notwithstanding our mandate that the district court focus on the “objective” in its causation analysis, the court proceeded to explain why “[t]here is no issue of Plan participants being unaware of the action anticipated nor of committee members intentionally trying to act in disregard of the Plan documents,” and why there is no issue “whether any of the committee members would have hesitated to sign the consent had it been properly circulated.” Tatum V, 2016 WL 660902, at *24. Indeed, the court devoted two full paragraphs to the intentions and thought processes of RJR employees Robert Gordon, Ann Johnston, McDara Folan, and Kenneth Lapiej-ko, none of whom is a hypothetical prudent fiduciary. See id.
The court then made its only conclusion about what a hypothetical fiduciary would have done: “Once the November Amendment document had been placed in the record, it is unlikely that a fiduciary would later find the need to look for minutes of a meeting or a consent in lieu of meeting formally adopting it.” Id. The court finished by stating that “[f]ailure to obtain consent in lieu of meeting does not affect determination of the substantive issues addressed by a prudent fiduciary.” Id. at *25.
*572 That analysis doesn’t adhere to the mandate because it fails to answer the mandate’s question whether a hypothetical prudent fiduciary would have ignored the Plan’s language.[2] Rather, the district court answered the inapposite question whether, given that the actual imprudent fiduciaries took all of the actions that they did, a hypothetical prudent fiduciary would have looked for evidence of formalities adopting the November Amendment.
Instead of factoring into the causation analysis the Plan’s requirement that the Nabisco Funds remain as frozen funds in the Plan, the district court found a reason to not factor that requirement into the causation analysis. Worse yet, the court’s reason for doing so was that the actual imprudent fiduciaries’ actions and intentions rendered the Plan’s language irrelevant. Tatum TV made clear that the November Amendment’s validity was not up for debate on remand, but the district court did everything short of re-litigating the issue.
Moreover, the district court’s characterization of the issue as failure to obtain consent in lieu of meeting rather than failure to follow the Plan’s requirement that the Nabisco Funds remain as frozen funds in the Plan is not faithful to our mandate. I understood our characterization in Tatum TV of the “requirements of the governing Plan document” as an “extraordinary circumstancef ],” 761 F.3d at 368, and the mandate as a whole to mean that the Plan’s requirement was an issue of substance to be tackled by the district court in the causation analysis. The court instead transformed the extraordinary into the ordinary by downplaying the flouting of the Plan’s language as an issue of whether RJR’s imprudent fiduciaries executed more-or-less sufficient procedures to remove that language from the Plan.
[[Image here]]
I cannot agree that the district court adhered to our mandate. Accordingly, I would vacate the judgment and remand for further proceedings.
I respectfully dissent.[3]

. For example, this case might look very different today, if it existed at all, had the March 1999 working group whimsically decided to wait one or two years before divesting. See Tatum IV, 761 F.3d at 354-55 (describing Carl Icahn's takeover bid for Nabisco on March 30, 2000, and the dramatic increases in the prices of Nabisco Common Stock and Nabisco Holdings by December 2000).

. I recognize that the district court stated that "it is more likely true than not that had a prudent fiduciary reviewed the information available to it at the time, including Plan documents ..., it would have decided to divest the Nabisco Funds at the time and in the manner as did RJR.” Tatum V, 2016 WL 660902, at *23. But this ritual incantation of Tatum TV's mandate stands in stark contrast to the district court's actual analysis of the issue.

. Given my take on the mandate issue, I refrain from extensive discussion of the merits, except to note two concerns. First, I believe the district court effectively double-counted litigation risk by finding that the market price for Nabisco's stock reflected publicly disclosed information (including litigation risk) but also finding that a hypothetical prudent fiduciary would have considered litigation risk without considering Nabisco's positive attributes. Second, the standard the district court set for gauging whether the fiduciaries should have retained the Nabisco Funds was whether market-beating results were foreseeable. As Tatum points out, generally speaking, that is a theoretically impossible standard to meet in an efficient market. See Fifth Third Bancorp v. Dudenhoeffer, - U.S. -, 134 S.Ct. 2459, 2471-72, 189 L.Ed.2d 457 (2014) (explaining the implications of the efficient market hypothesis).